```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION


 4


 5   LEGALFORCE RAPC WORLDWIDE,      )  C-22-03724 TLT
     P.C.,                          )
 6                                   )  SAN FRANCISCO, CALIFORNIA
                      PLAINTIFF,     )
 7                                   )  OCTOBER 3, 2023
               VS.                   )
 8                                   )  PAGES 1-32
     LEGALFORCE, INC.,               )
 9                                   )
                      DEFENDANT.     )
10   _____  )
     LEGALFORCE RAPC WORLDWIDE,      )  C-22-07627 TNT
11   P.C.,                          )
                                     )
12                    PLAINTIFF,     )
                                     )
13             VS.                   )
                                     )
14   LEGALON TECHNOLOGIES, INC., A   )
     DELAWARE CORPORATION,           )
15                                   )
                      DEFENDANT.     )
16   _____  )

17


18               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE TRINA L. THOMPSON
19               UNITED STATES DISTRICT JUDGE

20


21               APPEARANCES ON NEXT PAGE

22


23   REMOTELY REPORTED BY:  LEE-ANNE SHORTRIDGE, CSR, CRR
                      CERTIFICATE NUMBER 9595
24


25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
```

1

2       A P P E A R A N C E S:

3       FOR THE PLAINTIFFS:     RAJ ABHYANKER, PC
                                BY:  RAJ V. ABHYANKER
4                               1580 W. EL CAMINO REAL, SUITE 10
                                MOUNTAIN VIEW, CALIFORNIA  94040
5

6       FOR THE DEFENDANTS:     LAW OFFICES OF DAVID A. MAKMAN
                                BY:  DAVID A. MAKMAN
7                               483 SEAPORT COURT, SUITE 103
                                REDWOOD CITY, CALIFORNIA  94063
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | SAN FRANCISCO, CALIFORNIA                    OCTOBER 3, 2023 |
| 2 | P R O C E E D I N G S |
| 3 | (COURT CONVENED AT 2:05 P.M.) |
| 4 | THE COURT:  THANK YOU.  YOU MAY BE SEATED UNLESS |
| 5 | YOU'RE SOMEONE WHO'S PRESENTING AND CALLED TO COUNSEL'S TABLE. |
| 6 | THANK YOU. |
| 7 | WHICH ONE ARE YOU GOING TO START WITH? |
| 8 | THE CLERK:  NOW CALLING CASE NUMBERS 22-CV-03724, |
| 9 | LEGALFORCE RAPC WORLDWIDE, P.C. VERSUS LEGALFORCE, INC., AND |
| 10 | CASE NUMBER 22-CV-07627, LEGALFORCE RAPC WORLDWIDE, P.C. VERSUS |
| 11 | LEGALON TECHNOLOGIES, INCORPORATED. |
| 12 | COUNSEL, IF YOU COULD PLEASE STATE YOUR APPEARANCES, |
| 13 | BEGINNING WITH THE PLAINTIFF. |
| 14 | MR. ABHYANKER:  RAJ ABHYANKER FOR THE PLAINTIFF, |
| 15 | LEGALFORCE RAPC WORLDWIDE, P.C. |
| 16 | THE COURT:  GOOD AFTERNOON.  PLEASURE TO SEE YOU |
| 17 | AGAIN. |
| 18 | MR. MAKMAN:  GOOD AFTERNOON, YOUR HONOR. |
| 19 | MY NAME IS DAVID MAKMAN.  I'M HERE ON BEHALF OF |
| 20 | DEFENDANTS. |
| 21 | THE COURT:  PLEASURE TO SEE YOU AS WELL. |
| 22 | ALL RIGHT, COUNSEL.  AS A COURTESY, THE COURT PROVIDED A |
| 23 | NUMBER OF MY QUESTIONS IN ADVANCE BECAUSE WE HAVE TO BE VERY |
| 24 | MINDFUL OF THE TIME.  WE HAVE ONE OTHER CASE IN ADDITION TO THE |
| 25 | TWO LEGALFORCE CASES THAT ARE BEFORE ME. |

1      AND I ALSO DID THIS BECAUSE I DIDN'T WANT TO INTERRUPT

2   YOUR PREPARATION IN TERMS OF HOW YOU WOULD LIKE TO PRESENT THE

3   CASE.

4      SO WE'RE GOING TO START WITH THE DEFENDANT, BECAUSE I DO

5   HAVE ONE QUESTION THAT MAY NOT HAVE BEEN IN YOUR LIST OF

6   QUESTIONS, AND ONE QUESTION I HAVE IS, DO YOU CHALLENGE THE

7   ACCURACY OF MR. TADA'S TRANSLATION OF JAPANESE ARTICLES AND

8   PRESS RELEASES USED TO SUPPORT PLAINTIFF'S OPPOSITION?

9           MR. MAKMAN:  I HAVE NOT GONE OVER THAT IN DETAIL.  I

10   AM AWARE OF SOME ERRORS IN IT.  SO, I MEAN, IT WOULD DEPEND ON

11   WHICH, WHICH LANGUAGE.

12      THERE IS -- MY RECOLLECTION IS THERE'S A STATEMENT IN

13   THERE THAT I READ THE JAPANESE AS SAYING THAT THERE'S NO --

14   NOBODY IN THE MARKET, AND THAT'S NOT HOW IT WAS TRANSLATED.

15           THE COURT:  ALL RIGHT.  BECAUSE HE CLAIMED THAT

16   THE -- TO TRANSLATE THE ARTICLES -- HE CLAIMED TO TRANSLATE THE

17   ARTICLES, BUT THERE WAS NO CERTIFIED TRANSLATION, SO THAT'S WHY

18   I'M ASKING THAT PARTICULAR QUESTION.

19      ALL RIGHT.  COUNSEL, IF YOU WOULD LIKE TO RESPOND IN

20   OPPOSITION, AND THEN WE'LL RETURN OUR ATTENTION TO THE

21   DEFENDANT.

22           MR. ABHYANKER:  THANK YOU, YOUR HONOR.

23      SO YOU RAISED THREE QUESTIONS FOR US YESTERDAY.  WE DIDN'T

24   HAVE TIME TO FULLY DO THE CASE RESEARCH, AND I REALIZE THAT THE

25   ORDER YESTERDAY, AROUND 4:00 P.M., SAID THAT WE HAD TO SUBMIT

1    THOSE CASE LAW 48 HOURS BEFORE THE HEARING, SO THERE WAS NOT

2    ENOUGH TIME.

3            THE COURT:  YES, I APOLOGIZE FOR THAT.  THE WORDING

4    WAS PROBABLY IN ERROR.

5        BUT IT WAS REALLY TO ALERT YOU TO SOME AREAS WHERE WE

6    THOUGHT THAT THERE WERE SOME GAPS IN THE BRIEFING, AND THIS

7    WILL ASSIST ME IN MAKING A MORE INFORMED DECISION.  SOME OF

8    THESE QUESTIONS MAY NOT BE NEW, SOME OF THESE QUESTIONS ARE

9    REVISITED, SO IF YOU CAN INCORPORATE THEM INTO YOUR RESPONSE.

10           AND I APOLOGIZE FOR ANY DISCREPANCY IN THE ORDER ITSELF.

11           MR. ABHYANKER:  THAT'S ALL RIGHT, YOUR HONOR.

12       SO, FIRST OF ALL, I'LL START WITH ANSWERING THE COURT'S

13   FIRST QUESTION, WHICH WAS THE LEGAL AUTHORITY FOR THE ASSERTION

14   THAT ADVERTISING OR SELLING EQUITY IN PRIVATE COMPANIES IS

15   CONSIDERED A USE IN COMMERCE UNDER THE LANHAM ACT.

16       SO, FIRSTLY, I DON'T THINK THERE'S ANY DEFINITE CASE LAW

17   ON THE ISSUE, SO WE ADMIT THAT.  THE AVAILABLE CASE LAW THAT WE

18   DID FIND LEADS ONE TO BELIEVE THAT IT DOES, AND THE PREDICATE

19   OF THAT IS 15 U.S.C. 1127, WHICH DEFINES "USE IN COMMERCE" AS

20   THE BONA FIDE USE OF A TRADEMARK IN THE ORDINARY COURSE OF

21   TRADE AND NOT MERELY A RESERVATION OF THAT RIGHT IN A MARK.

22       THE STATUTE DOESN'T SPECIFY WHETHER THE DEFINITION APPLIES

23   TO TRADEMARKS FOR GOODS OR SERVICES.  THE COURTS HAVE

24   INTERPRETED IT TO APPLY TO BOTH, AS WELL AS OTHER INTANGIBLE

25   MATTERS, SUCH AS WHICH CAN'T BE HELD OR SEEN AS NORMAL

1    SERVICES, AND PROBABLY THAT'S WHEN THAT STATUTE WAS

2    PROMULGATED.

3        SO SEVERAL REASONS WHY ADVERTISING AND SELLING EQUITY IN A

4    PRIVATE COMPANY COULD BE CONSIDERED USE IN COMMERCE UNDER THE

5    LANHAM ACT.  FIRST, ADVERTISING AND SELLING EQUITY IS A

6    COMMERCIAL ACTIVITY.  COMPANIES THAT ADVERTISE OR SELL EQUITY

7    SEEK TO RAISE MONEY FROM INVESTORS IN ORDER TO GROW THEIR

8    BUSINESS.  IT'S CLEAR THAT, JUST BASED ON THAT ALONE, IT'S A

9    CLEAR EXAMPLE OF THE BONA FIDE USE OF A TRADEMARK IN THE

10   ORDINARY COURSE OF TRADE, WHICH IS THE DEFINITION UNDER

11   15 U.S.C. 1127.

12       SECONDLY --

13       THE REPORTER:  I'M SORRY, COUNSEL.  CAN YOU RESTATE

14   THAT, PLEASE?

15       THE COURT:  OUR COURT REPORTER IS REMOTE, AND SO

16   DON'T BE ALARMED BY THE VOICE.

17       BUT IF YOU CAN, MAKE SURE THAT YOU'RE SPEAKING INTO THE

18   MICROPHONE.  I ALWAYS SAY, CONSIDER YOURSELF A ROCK STAR FOR A

19   DAY.  AND SLOW DOWN, BECAUSE EVEN THOUGH SHE'S REMOTE, I CAN

20   SEE THE SMOKE IN THE BACKGROUND FROM HER FINGERS.

21       SO IF YOU CAN JUST SLOW DOWN JUST A LITTLE BIT.

22       MR. ABHYANKER:  YES, YOUR HONOR.

23       SECOND, THE ADVERTISING OR SALE OF EQUITY CAN CREATE

24   PUBLIC ASSOCIATION BETWEEN A COMPANY'S MARK AND ITS GOODS AND

25   SERVICES.  FOR EXAMPLE, IF A PRIVATE COMPANY LIKE THE

1    DEFENDANT, WHICH SELLS SOFTWARE TO ADVERTISE EQUITY INVESTORS,

2    INVESTORS MAY COME TO ASSOCIATE THE COMPANY'S TRADEMARK WITH

3    ITS SOFTWARE AND SERVICES.

4         THAT ASSOCIATION CAN LEAD TO CONFUSION AMONG CONSUMERS WHO

5    MAY BELIEVE THAT THE COMPANY'S TRADEMARKS ARE AFFILIATED WITH

6    THE GOODS AND SERVICES THEY'RE NOT.

7         THEY'VE ALREADY SAID, AS WE MENTIONED IN OUR COMPLAINT AS

8    AMENDED, THAT THE PRODUCT NAMES HAVE NOT CHANGED FOR THIS

9    DEFENDANT.  THEY CONTINUE TO BE CALLED LEGALFORCE.

10        THIRD, THE ADVERTISING OR SALE OF EQUITY CAN DILUTE THE

11   VALUE OF A TRADEMARK, WHICH IS OUR, OUR MARK.  AND ALTHOUGH WE

12   HAVEN'T CLAIMED DAMAGES FOR DILUTION, WE BELIEVE WE HAVE A

13   SIGNIFICANTLY IMPORTANT MARK WHICH RESERVES BRAND EQUITY TO US

14   THROUGH OUR INVESTMENT IN THAT MARK.

15          THE COURT:  ALL RIGHT.  CAN I INTERRUPT FOR JUST A

16    MOMENT?  AND KEEP IN MIND, EACH SIDE HAS 15 MINUTES.

17        WHAT SPECIFIC HARM DID PLAINTIFF EXPERIENCE BECAUSE OF THE

18   DEFENDANT'S ALLEGED INFRINGEMENT?

19          MR. ABHYANKER:  YEAH.  SO WE BELIEVE THAT THE HARM

20    THAT WE'VE EXPERIENCED IS THAT WE HAVE A WEAKER ASSOCIATION

21    BETWEEN OUR GOODS AND SERVICES AND OUR BRAND AS A RESULT OF

22    THEIR USE OF THE SOFTWARE.  WE HAVE BASICALLY LOST CONTROL OF

23    OUR OWN REPUTATION.  WE'VE ALLEGED THAT THE DEFENDANT IS

24    ENGAGED IN ACTIVITY, EITHER UNLAWFUL OR UNETHICAL, AND THAT

25    BRAND PRODUCT CONTINUES TO BE CALLED LEGALFORCE.

1          AND WHILE THAT CONTINUES TO BE CALLED LEGALFORCE TO

2    PROMOTE ITS OWN PRODUCTS AND SERVICES, IT CAN DAMAGE -- IT DOES

3    DAMAGE OUR BRAND VALUE.

4          AND THEY'RE IN A COMPETING INDUSTRY.

5          THE COURT:  AND HOW DOES IT DAMAGE THE BRAND VALUE?

6    I GUESS I'M TRYING TO GET AS TANGIBLE AS I CAN.

7          MR. ABHYANKER:  TO CALCULATE THE EXTENT OF THE BRAND

8    VALUE, WE'D NEED EXPERTS.

9          BUT ONE CAN SAY THAT A COMPANY WHO'S USING ANOTHER'S MARK

10   IN A MANNER WHICH IS UNLAWFUL OR UNETHICAL, ACCORDING TO THE

11   PLAINTIFF, WILL DAMAGE THE BRAND VALUE OF THE PLAINTIFF'S MARK.

12         NOW, IT'S -- IT GIVES THEM AN UNFAIR ADVANTAGE,

13   FURTHERMORE.

14         WE'VE ALSO ALLEGED THAT, YOU KNOW, WE WERE SEEKING THE

15   SIMILAR KIND OF VENTURE CAPITAL FUNDS IN 2022.  WHEN WE GO OUT

16   TO THE PRIVATE MARKETS TO SEEK VENTURE CAPITAL, WE WILL NOW BE

17   DISADVANTAGED AS OUR BRAND HAS BEEN ASSOCIATED WITH AN ENTITY

18   THAT RAISED MONEY WITH THAT VERY SAME BRAND WHICH WE ALLEGE IS

19   DOING THINGS WHICH ARE AGAINST THE RULES.

20         THE COURT:  NOW, IS THIS SPECULATIVE OR ACTUAL?

21         MR. ABHYANKER:  THESE ARE ACTUAL ISSUES.

22         AND SINCE 2023 TO 2024, THE MARKET FOR PRIVATE INVESTMENTS

23   HAS CHANGED.  THE VALUATIONS HAVE CHANGED.

24         WE'VE PERMANENTLY SUFFERED THAT HARM TODAY.  AND IT'S NOT

25   A HARM THAT WE CAN JUST SIT HERE AND GUESS AND PUT A NUMBER ON,

1    BUT IT IS A REAL HARM, AND IT IS ONE THAT EXPERTS CAN HELP US

2    CALCULATE THE TRUE VALUE OF.

3         THE COURT:  ALL RIGHT.  IS THERE ANY LEGAL SUPPORT OR

4    AUTHORITY FOR SPECIFIC JURISDICTION RELATED TO FILING A

5    TRADEMARK OR OPERATING A FOREIGN WEBSITE?

6         MR. ABHYANKER:  SO THE CASE LAW, AGAIN, IS NOT VERY

7    CLEAR ON THE ISSUE, ADMITTEDLY, AND WE WOULD LIKE TO RESERVE

8    AND HAVE A FINAL ORDER FOR APPEAL BECAUSE WE WILL BE APPEALING

9    THIS TO THE NINTH CIRCUIT.

10        HOWEVER, THE SPECIFIC ARGUMENT OF THIS IS BASED ON THE

11   INTENT TO USE TRADEMARK IS A COMMERCIAL ACTIVITY THAT'S

12   DIRECTED TO THE U.S. MARKET.

13        THERE IS CASE LAW, WHICH WE'RE NOT GOING TO ARGUE NOW

14   BECAUSE WE DIDN'T GIVE THE DEFENDANT NOTICE GIVEN THE ORDER WAS

15   UNCLEAR ON THAT, WHICH SAYS THAT AN INTENT TO USE A MARK IS A

16   BONA FIDE REPRESENTATION TO THE GOVERNMENT THAT THEY INTEND TO

17   USE THE TRADEMARK WITHIN THE UNITED STATES.

18        THAT CREATES A SUFFICIENT CONNECTION BETWEEN THE DEFENDANT

19   AND THE UNITED STATES TO JUSTIFY SPECIFIC JURISDICTION.

20   THEY'VE THEREFORE PURPOSELY AVAILED THEMSELVES IN VIEW OF THE

21   FACT THAT THEY'RE CONDUCTING A COMMERCIAL ACTIVITY IN THE

22   UNITED STATES WITH A DECLARATION, WHICH IS UNDER OATH, OR A

23   SWORN STATEMENT THAT'S UNDER OATH TO THE U.S. GOVERNMENT, WHICH

24   EITHER IS TRUE OR IT'S FALSE.

25        IN EITHER CASE, IT IS A -- IF THEY LIED TO THE U.S. PTO IN

1    A VERIFIED STATEMENT OR DECLARATION, THEY PURPOSELY AVAILED

2    THEMSELVES; OR IF THEY WERE TRUTHFUL THAT THEY REALLY INTENDED

3    TO USE THE MARK IN THE UNITED STATES, THEY'VE ALSO AVAILED

4    THEMSELVES.

5          SO TO THE EXTENT THAT THE FILING OF A TRADEMARK IS A SWORN

6    STATEMENT TO THE GOVERNMENT WHICH PROVIDES THE JUSTIFICATION

7    FOR BONA FIDE INTENT TO USE, WE BELIEVE THAT CONNECTION IS

8    FORMED TO THE U.S. THROUGH THAT MECHANISM.

9             THE COURT:  ALL RIGHT.

10         I HAVE A COUPLE MORE QUESTIONS AND THEN I'M GOING TO TURN

11   MY ATTENTION TO THE DEFENSE.

12         DO YOU HAVE ANY LEGAL SUPPORT FOR YOUR ASSERTION THAT

13   ADVERTISING OR SELLING EQUITY IN A PRIVATE COMPANY QUALIFIES AS

14   A USE IN COMMERCE UNDER THE LANHAM ACT?

15            MR. ABHYANKER:  SO, YOUR HONOR, WE'VE CITED A NUMBER

16    OF CASES THAT ARE, AGAIN, NOT EXACTLY ON POINT, BUT CLOSE,

17    WHICH DEAL WITH STOCK TICKERS, AND THOSE STOCK TICKER CASES

18    THAT WE'VE CITED IN OUR BRIEF IN A RELATED CASE, NOT IN THIS

19    CASE, BUT IN THE RELATED CASE WITH LEGALON TECHNOLOGIES, THE

20    U.S. ENTITY, WE'VE CITED A NUMBER OF THOSE CASES WHICH I WOULD

21    INCORPORATE BY REFERENCE.

22         BUT IN ESSENCE WHAT THEY SAY IS A COMPANY THAT DECIDES TO

23   USE A STOCK TICKER SYMBOL TO ADVERTISE ITS STOCK FOR SALE IN

24   SOME CASES CAN INFLUENCE A TRADEMARK.

25         NOW, CERTAINLY THE ITEM THAT'S BEING SOLD IS INTANGIBLE.

1    THE ITEM THAT'S BEING SOLD AND TRANSACTED THROUGH THE USE OF

2    THAT BRAND AND STOCK TICKER IS AN EQUITY, AND THAT EQUITY IS IN

3    A CORPORATION.

4         SO THE ADVERTISEMENT OCCURS THROUGH NASDAQ, WHICH DEFINES

5    WHERE THOSE STOCK TICKERS ARE PUBLISHED, AND THEREFORE, THE

6    SAME CASE LAW CAN BE USED HERE.

7         NOW, THE ARGUMENT THAT THEY MAKE IS SOME OF THEIR MARKS

8    ARE FAMOUS AND THEREFORE THEY'RE SOMEHOW DISTINGUISHED.

9         I DON'T THINK THAT HAS ANYTHING TO DO WITH DILUTION.

10   DILUTION OF THE MARK AND LIKELY CONFUSION ARE TWO SEPARATE

11   THINGS.

12        WE HAVE ALLEGED THAT, DESPITE OUR MARK NOT BEING FAMOUS,

13   WE DON'T BELIEVE ALL THOSE OTHER MARKS -- THE DECISIONS THAT

14   HELD THAT THOSE STOCK TICKERS COULD BE RELATED TO ADVERTISING

15   THE EQUITIES AND THEREFORE INFRINGING IS AN INDEPENDENT ISSUE

16   FROM THE FAME OF THOSE MARKS.

17        AND THAT IS THE CLOSEST ANALOGY WE HAVE, AND IF WE NEED TO

18   GO TO THE NINTH CIRCUIT TO RESOLVE THAT, WE WILL.

19             THE COURT:  OKAY.  THANK YOU.

20        NOW, TWO MORE QUESTIONS, PERHAPS THREE, TO COUNSEL, AND

21    THEN CLEARLY I'M GOING TO TURN MY ATTENTION TO DEFENSE, BECAUSE

22    AS WE'RE TALKING, OTHER QUESTIONS KIND OF ARE ARISING.

23        YOU APPARENTLY HEARD THAT DEFENDANT CURRENTLY MARKETS ITS

24   PRODUCT IN THE UNITED STATES, AND YOU CITE TO EXHIBIT 1 OF YOUR

25   DECLARATION.  WHERE IN THIS PRESS RELEASE DOES IT STATE THAT

1    THE DEFENDANT LEGALFORCE IS MARKETING ITS PRODUCTS IN THE

2    UNITED STATES?

3            MR. ABHYANKER:  OKAY.  SO I NEED TO REVIEW THE TIME

4    AND DATE OF THAT DECLARATION.

5            THE COURT:  OKAY.

6            MR. ABHYANKER:  AND I WOULD NEED TO -- SO WHEN I SIT

7    HERE TODAY, I DON'T BELIEVE THE BUSINESS THAT IS THE DEFENDANT

8    IN THIS CASE IS OPERATING IN THE UNITED STATES DIRECTLY.

9        AT THE TIME OF THE DECLARATION, AT THE TIME OF THIS

10   LAWSUIT, THEY HAD NOT YET CHANGED THEIR NAME TO LEGALON.  THEY

11   HAD NOT YET CHANGED OR REMOVED ANY OF THEIR STOCK -- THEIR

12   TRADEMARK VIOLATIONS.  THEY WERE CALLED LEGALFORCE.

13       AND SO IN HINDSIGHT, I CAN'T GO BACK AND SAY -- I DO NOT

14   BELIEVE, YOUR HONOR, TODAY THEY'RE USING THE MARK.

15           THE COURT:  UM-HUM.

16           MR. ABHYANKER:  BUT THAT'S NOT SUFFICIENT TO WARRANT

17   THIS CASE FOR DISMISSAL.  THEY STILL OWE US DAMAGE FOR THE HARM

18   THEY'VE DONE AND CAUSED AS A RESULT OF THEIR PRIOR CONFUSION OF

19   SOURCE ORIGIN THAT THEY HAVE CREATED IN OUR BUSINESSES.

20           THE COURT:  ALL RIGHT.  AND WHEN WE GO BACK TO THE

21   DISCUSSION ABOUT HARM, THAT LEADS ME BACK TO THAT QUESTION OF

22   CAN YOU PROVIDE MORE INFORMATION ABOUT THE SPECIFIC INJURY THAT

23   YOU SUFFERED UNDER THE LANHAM ACT?

24           MR. ABHYANKER:  YOUR HONOR, I DON'T THINK THAT IN

25   CASES SUCH AS THIS LITIGATION WE HAVE TO ALLEGE AND QUANTIFY

1    THE HARM AT THE ONSET OF A DISPUTE.  WE HAVE TO ALLEGE THAT WE

2    HAVE SUFFERED HARM, AND WE HAVE SUFFERED HARM, AND IT CAN BE

3    UNDERSTOOD -- IT'S VERY RARE, IN FACT, IN TRADEMARK CASES TO

4    SOME -- FOR A PLAINTIFF TO BE ASKED AND REQUIRED TO QUANTIFY

5    ALL THE HARM IT SUFFERED.  WE DON'T HAVE ALL THE FACTS AND WE

6    HAVEN'T YET CONDUCTED THE FULL DISCOVERY.

7         SO I DON'T KNOW, BUT I DON'T THINK THAT'S UNUSUAL IN CASES

8    LIKE THIS.

9              THE COURT:  ALL RIGHT.  AND WHILE I'M ADDRESSING THE

10   DEFENSE, PLEASE GIVE SOME THOUGHT TO THE EXHIBITS THAT HAVE

11   BEEN PROVIDED IN SUPPORT OF THE DEFENSE ARGUMENT RELATED TO

12   SUBJECT MATTER AND PERSONAL JURISDICTION AND WHETHER YOU HAVE A

13   RESPONSE TO ANY OF THE PROFFERED EVIDENCE.

14        ALL RIGHT.  COUNSEL FOR THE DEFENDANT?

15             MR. MAKMAN:  SURE.

16        SO, BIG PICTURE, THIS IS A PLAINTIFF THAT HAS NOT BEEN

17   HARMED, AND YOU'VE ADDRESSED THAT DIRECTLY IN YOUR QUESTIONS,

18   AND IT'S DIRECTLY RELEVANT, AT LEAST FOR LEGALFORCE, FOR THE

19   JAPANESE COMPANY NOW CALLED LEGALON, LEGALON JAPAN, DIRECTLY

20   RELEVANT TO MINIMUM CONTACTS WHETHER THERE'S HARM.

21        THAT'S IN THE CALDER CASE WHICH WAS CITED IN OUR -- THE

22   FIRST MOTION -- THE FIRST AMENDED COMPLAINT.  IT'S VERY CLEAR

23   THAT FOR SPECIFIC JURISDICTION, YOU HAVE TO TIE A HARM TO THE

24   FORUM STATE.

25        IN THAT CONTEXT, PLAINTIFF HAS ALLEGED TWO CAUSES OF

1   ACTION THAT ARE FEDERAL.  BOTH ARE FOR TRADEMARK INFRINGEMENT.

2   BOTH USE STATUTES THAT REQUIRE THE USE OF A MARK ON GOODS AND

3   SERVICES.

4       TRADEMARK IS TO PREVENT LIKELIHOOD OF CONFUSION, PREVENT

5   CONFUSION OF CONSUMERS WHO ARE BUYING GOODS AND SERVICES.

6   BUYING GOODS AND SERVICES IS TRADING.

7       BUYING STOCKS IS MORE LIKE FINANCE, AND I'LL DRILL DOWN ON

8   THAT.

9       BUT -- SO UNDER BOTH OF THE STATUTES, USE IN COMMERCE ON

10  GOODS AND SERVICES, AND IF THAT DOESN'T HAPPEN, HE'S NOT

11  HARMED.

12      NOW, YOU'VE ASKED ABOUT FILING AN APPLICATION, WHETHER

13  THAT CREATES JURISDICTION, AND THAT'S ACTUALLY A FAIRLY

14  COMPLICATED ISSUE.  I CAN TALK ABOUT IT IN THE ABSTRACT.  I

15  HAVEN'T DONE THE CASE LAW RESEARCH IN DETAIL.  BUT IF YOU FILE

16  TO USE THE APPLICATION, YOU CANNOT REGISTER YOUR TRADEMARK AND,

17  THEREFORE, DO NOT HAVE RIGHTS OUTSIDE THE PATENT OFFICE UNTIL

18  YOU USE THE MARK.

19      WE FILED AN INTENT TO USE AND WE ABANDONED IT, AND SO WE

20  DIDN'T USE IT AND WE DIDN'T GET TRADEMARK RIGHTS.

21      SO AT THAT STAGE, WE HAVE NOT CREATED JURISDICTION

22  ANYWHERE IN THE UNITED STATES OTHER THAN AT THE TRADEMARK

23  OFFICE, AND THERE'S A SPECIAL STATUTE -- AT LEAST IN PATENT

24  CASES, I ASSUME IT ALSO EXISTS IN TRADEMARK CASES -- THAT SAYS

25  WHERE YOU'RE DEALING WITH SOMEBODY WHO HAS AN INTELLECTUAL

1    PROPERTY RIGHT GRANTED BY THE U.S. PATENT AND TRADEMARK OFFICE,

2    YOU HAVE JURISDICTION AND VENUE IN D.C. TO DEAL WITH CLAIMS

3    THAT ARISE OUT OF THAT.

4        IT OFTEN HAPPENS THAT PEOPLE HAVE PATENTS IN THE U.S.,

5    THEY DON'T DO BUSINESS ANYWHERE IN THE U.S., AND THEY GET SUED

6    IN D.C.  IF YOU WANT TO INVALIDATE THE PATENT, THAT'S ONE WAY

7    THAT IT'S DONE.

8        THERE ARE ALSO PROCEEDINGS AT THE TRADEMARK OFFICE.

9        SO THEN IMAGINE YOU FILE THE INTENT TO USE, YOU START

10   USING, YOU GET YOUR REGISTRATION, AND IMAGINE A COMPANY THAT

11   HAS REGISTERED A TRADEMARK AND IS USING IT ONLY IN DELAWARE --

12   IT'S A FEDERAL REGISTRATION, BUT THEY'RE USING IT IN

13   DELAWARE -- AND THERE'S INFRINGEMENT IN CALIFORNIA.  THEY CAN'T

14   COME TO CALIFORNIA AND GET INJUNCTIVE RELIEF IF THEY'RE NOT

15   USING IT IN CALIFORNIA.

16       SO IT WOULDN'T BE FAIR TO SAY THAT CALIFORNIA HAS

17   JURISDICTION OVER THEM WHEN THEY'RE NOT HERE AND THEY DON'T

18   HAVE TRADEMARK RIGHTS IN THE STATE OF CALIFORNIA BASED ON A

19   LACK OF USE HERE.

20       SO I THINK IT'S A COMPLICATED QUESTION AS TO WHEN

21   TRADEMARK RIGHTS TURN INTO SOMETHING THAT WILL CREATE

22   JURISDICTION.

23       BUT HERE THERE'S NO DECLARATORY JUDGMENT ISSUES.  THERE'S

24   NO CEASE AND DESIST LETTERS.  WE FILED AN INTENT TO USE, WE

25   ABANDONED, AND THEREFORE, JURISDICTION IN CALIFORNIA NEVER

1   ATTACHED TO OUR APPLICATION FOR LEGALFORCE.  THAT'S THE ONE WE

2   ABANDONED.

3        WE DO HAVE ONE ON LEGALON, BUT THAT'S DIFFERENT.

4        THE COURT:  DO YOU MIND IF I ASK THAT QUESTION, SINCE

5   IT'S THE SAME COUNSEL?

6        MR. MAKMAN:  YEAH.

7        THE COURT:  HOW DOES LEGALON TECHNOLOGY INCORPORATED

8   OBTAIN ITS FUNDING?

9        MR. MAKMAN:  THE U.S. COMPANY HAS RECEIVED I THINK

10   THREE, THREE WIRE TRANSFERS FROM JAPAN THAT ARE -- AND THEY'RE

11   IN RETURN FOR SOLD SHARES IN THE U.S. COMPANY TO THE PARENT

12   COMPANY.  THERE'S A COMPLEX WEB OF AGREEMENTS AND SHAREHOLDER

13   RIGHTS AND BOARD RIGHTS THAT -- YOU KNOW, IT'S A PROPERLY

14   GOVERNED CORPORATE ENTITY.

15        THE COURT:  SO IN ITS MOST SIMPLISTIC TERMS, CAN --

16   WOULD IT BE WRONG FOR ME TO CONSIDER LEGALFORCE INCORPORATED AS

17   KIND OF THE PARENT AND LEGALON AS KIND OF THE OFFSPRING?

18        MR. MAKMAN:  IT'S A WHOLLY OWNED SUBSIDIARY.

19        THE COURT:  UM-HUM.

20        MR. MAKMAN:  BUT THE WAY THE MONEY MOVES, WE SELL

21   SHARES, THEY SEND MONEY.  ONCE WE SELL THE SHARES, THE MONEY IS

22   OURS, IS THE U.S. COMPANY'S, AND THE SHARES BELONG TO THE

23   JAPANESE COMPANY.

24        AND SO THEN YOU HAVE, OKAY, THE SHARED JAPANESE COMPANY

25   HAS SHAREHOLDER RIGHTS.  THE CHAIRMAN OF THE BOARD IS THE

1    AMERICAN GUY AND HE HAS A DUTY TO THE U.S. ENTITY, NOT TO THE

2    JAPANESE ENTITY UNDER CORPORATE LAW, RIGHT, FIDUCIARY DUTY OF

3    THE CHAIRMAN OF THE BOARD TO THE COMPANY UNDER DELAWARE LAW.

4         AND WHEN I SAY IT'S A COMPLEX WEB, I MEAN THERE'S A

5    COMPLEX WEB, BUT IT'S THE ORDINARY CORPORATE STRUCTURE THAT YOU

6    HAVE FOR A PARENT AND SUBSIDIARY.

7         THE COURT:  OKAY.  AND IS THERE LITIGATION GOING ON

8    IN JAPAN BY CHANCE?

9         MR. MAKMAN:  I BELIEVE THERE STILL IS.  WE, WE --

10        MR. ABHYANKER:  NOT YET.

11        MR. MAKMAN:  THERE'S A MOTION TO DISMISS PENDING.

12        MR. ABHYANKER:  THAT CASE HAS BEEN DECIDED --

13        THE COURT:  ONE MOMENT.  I DIDN'T ALLOW HIM TO

14   INTERRUPT YOU, AND YOU'LL BE ABLE TO CORRECT THE RECORD.

15        MR. MAKMAN:  IT'S MY UNDERSTANDING THAT THERE'S A

16   MOTION TO DISMISS PENDING, BUT I DO NOT KNOW WHAT THE STATUS OF

17   THAT IS.

18        THE COURT:  AND THEN JUST HUMOR ME FOR ONE MOMENT.

19   BECAUSE OF THIS RELATIONSHIP BETWEEN LEGALFORCE INCORPORATED

20   AND LEGALON, DOES LEGALON'S TRADEMARK PRESENT A LIKELIHOOD OF

21   CONFUSION BY USING THE TERM "LEGAL"?

22        MR. MAKMAN:  I MEAN, I THINK -- OF COURSE NOT.  I

23   DON'T THINK THAT'S A PLAUSIBLE ARGUMENT.  THAT'S WHAT I'VE

24   ARGUED IN MY BRIEF.

25        GIVEN THAT WE'RE SELLING CONTRACT REVIEW SOFTWARE, IT'S ON

1    THE DESCRIPTIVE END OF THE SPECTRUM AND IS NOT ENTITLED TO --

2    IT'S NOT ENTITLED TO STRONG RIGHTS.

3        AND WHEN YOU TALK ABOUT MARKS AS A WHOLE, RECALL THAT HIS

4    PRODUCT IS A PIGGY BANK SOLD BY LEGALFORCE AND OURS IS AI

5    REVISE AND AI REVIEW FEATURES OF THE LEGALON TECHNOLOGY

6    SOFTWARE.  SO IT'S A VERY DIFFERENT NAME.

7        THE COURT:  SO EVEN THOUGH PLAINTIFF IS CONSIDERED

8    LEGALFORCE RAPC WORLDWIDE PC, AND THEN WE HAVE LEGALFORCE

9    INCORPORATED OUT OF JAPAN, AND THEN LEGALON HERE IN THE

10   UNITED STATES?

11       MR. MAKMAN:  AND THE JAPANESE COMPANY HAS CHANGED ITS

12   NAME, AND SO THEY'RE BOTH CALLED LEGALON AT THIS POINT.  THAT'S

13   WHY I'VE BEEN CALLING IT LEGALON JAPAN AND LEGALON U.S., A

14   WHOLLY OWNED SUBSIDIARY RELATIONSHIP.  AND OBVIOUSLY I'LL ASK

15   FOR YOU TO CHANGE THE CAPTION IF THE CASE GOES FORWARD.  BUT

16   GIVEN YOUR TENTATIVE, I'M HOPING IT WON'T.

17       I WOULD ALSO LIKE TO POINT OUT, BEFORE I FORGET,

18   PARAGRAPH 102 OF THE COMPLAINT IN THE LEGALON -- IN THE CASE

19   AGAINST LEGALON WHERE PLAINTIFF EXPLICITLY SAYS HE IS NOT

20   SEEKING REMEDIES AS A FAMOUS MARK UNDER DILUTION THEORY, ALL OF

21   HIS ARGUMENTS ON HARM TODAY ARE DILUTION ARGUMENTS, ARE

22   ARGUMENTS THAT THE POWER OF THE MARK IS DIMINISHED BECAUSE

23   THERE ARE OTHERS WITH SIMILAR MARKS IN THE SPACE.

24       THAT'S NOT WHAT HE'S ASSERTED IN THE CASE.  THAT'S WHAT

25   HE'S EXPLICITLY WITHDRAWN.  THE TICKER CASES ARE DILUTION

1    CASES.  THE ELEMENTS OF DILUTION REQUIRE A FAMOUS MARK IN THE

2    FEDERAL STATUTE.  THE STATUTES THAT HE'S ASSERTED ARE

3    DIFFERENT.  THEY REQUIRE USE OF THE MARK ON GOODS AND SERVICES.

4         AND SO ONE OF THE PROBLEMS WITH THIS CASE, A, HE HASN'T

5    BEEN HARMED; B, HE WANTS A HUNDRED MILLION DOLLARS, AND IN

6    ORDER TO GET IT, HE'S CHANGING LEGAL THEORIES, HE'S A MOVING

7    TARGET.  WE HAVE SIX COMPLAINTS SO FAR IN THIS ACTION, AND EACH

8    ONE IS MORE FARFETCHED THAN THE LAST.

9         WHEN WE TALK ABOUT EQUITY, THE IDEA THAT THE HUNDRED

10   MILLION DOLLARS THAT WAS INVESTED IN THE JAPANESE COMPANY CAN

11   SOMEHOW BE REDIRECTED AND GIVEN TO THE PLAINTIFF ON A TRADEMARK

12   THEORY, IT MAKES NO SENSE.  WE'RE GOING TO HAVE TO CALL OUR

13   INVESTORS AND SAY, OH, SORRY, THE COURT RULED THAT BECAUSE THEY

14   HAVE A REGISTRATION ON LEGALFORCE, YOUR STOCK IS NOW WORTHLESS

15   AND ALL OF YOUR MONEY HAS BEEN GIVEN TO PLAINTIFF.

16        THAT'S NOT EQUITABLE AND THEY'RE NOT EVEN PARTIES TO THE

17   CASE, OUR INVESTORS.  SO THAT -- THAT'S WHY THERE'S NO CASE

18   LIKE THAT.

19             THE COURT:  READING BETWEEN THE LINES, IT APPEARS

20    THAT COUNSEL IS KIND OF ARGUING AN ALTER EGO THEORY, AND A

21    COUPLE OF QUESTIONS.

22        DID LEGALFORCE, NOW LEGALON JAPAN, COMINGLE ITS ASSETS

23   WITH LEGALON TECHNOLOGIES U.S.?

24             MR. MAKMAN:  NO, THEY'RE NOT COMINGLED.  AS I'VE

25    SAID, WE SOLD SHARES.

```
1                THE COURT:  ALL RIGHT.

2                MR. MAKMAN:  AND WE COULD DIG INTO THAT, BUT WE'VE

3       HAD A YEAR OF DISCOVERY, SPENT OVER A MILLION DOLLARS FIGHTING

4       OVER THIS MATTER, AND THERE'S NO EVIDENCE OF COMINGLING.

5                THE COURT:  THIS IS TO MAKE SURE THE RECORD IS JUST

6       CLEAR.

7                MR. MAKMAN:  SURE.  SORRY.

8                THE COURT:  IS LEGALFORCE JAPAN -- LEGALON JAPAN

9       RESPONSIBLE FOR LEGALON TECHNOLOGIES' DEBTS?

10               MR. MAKMAN:  NO.

11               THE COURT:  DOES LEGALON JAPAN AND LEGALON U.S.

12      DISPLAY AN IDENTICAL EQUITABLE OWNERSHIP?

13               MR. MAKMAN:  I DON'T FULLY KNOW WHAT YOU MEAN BY

14      THAT.

15           BUT THEY ARE SEPARATELY INCORPORATED AND THEY ARE SELLING

16      DIFFERENT PRODUCTS TO DIFFERENT MARKETS WITH DIFFERENT

17      FEATURES.  THEY ARE SORT OF A RELATED BASE OF CODE, BUT THEY

18      PRESENT TO THE WORLD AS PARENT AND WHOLLY OWNED SUBSIDIARY.

19               THE COURT:  ALL RIGHT.  DOES LEGALON JAPAN AND

20      LEGALON U.S. USE THE SAME OFFICES AND EMPLOYEES?

21               MR. MAKMAN:  THEY DO NOT.  THERE IS SOME -- THERE'S

22      SOME CROSS-POLLINATION, BUT THERE'S AN AGREEMENT THAT

23      ESTABLISHES WHAT SERVICE IS PROVIDED BY WHICH COMPANY TO

24      WHICH -- TO THE OTHER.

25               AND SO -- YEAH.
```

1          THE COURT:  ALL RIGHT.

2          MR. MAKMAN:  I EXPECT THAT'LL CHANGE OVER TIME AS

3     WELL.  THEY'VE HIRED SOME ENGINEERS HERE NOW.  THE OTHER

4     ENGINEERS WERE IN JAPAN, BUT IT'S A START-UP AND THINGS ARE

5     FLUID, RIGHT?

6          THE COURT:  ALL RIGHT.  STILL KIND OF WALKING THROUGH

7     THE ALTER EGO ARGUMENT --

8          MR. MAKMAN:  SURE.

9          THE COURT:  -- IS LEGALON JAPAN A SHELL OR CONDUIT

10    FOR LEGALON U.S.?

11         MR. MAKMAN:  IS LEGALON JAPAN A SHELL FOR

12    LEGALON U.S.?  NO.

13         THE COURT:  ALL RIGHT.  AND DOES LEGALON JAPAN -- I'M

14    NOT GOING TO ASK THAT QUESTION.

15       I'M EXTRACTING SOME QUESTIONS BASED ON SOME OF THE CASES.

16         MR. MAKMAN:  YEAH, I UNDERSTAND.

17         THE COURT:  DOES LEGALON JAPAN AND LEGALON U.S.

18    DISREGARD ANY CORPORATE FORMALITIES, SEGREGATE THE CORPORATE

19    RECORDS, OR HAVE IDENTICAL OFFICERS AND DIRECTORS?  I KNOW

20    THAT'S A COMPOUND QUESTION, BUT --

21         MR. MAKMAN:  YEAH, AND, YOU KNOW, ONE CAN'T

22    ABSOLUTELY STATE 100 PERCENT NO.

23       BUT THEY'RE IN -- THEY'RE DOING THEIR BEST TO COMPLY WITH

24    THE LAW, AND THERE IS NO -- AND THAT'S WHY I FOCUSSED ON HARM.

25    IF YOU WANT TO PIERCE THE VEIL, YOU'VE GOT TO SHOW THAT THERE'S

1    AN EQUITABLE REASON FOR THAT, THAT SOME HARM IS COMING OUT OF

2    THE CORPORATE -- OF THE USE OF THE CORPORATE -- I DON'T HAVE TO

3    PROVE PERFECTION IN MY IMPLEMENTATION OF THE CORPORATE FORM.  I

4    HAVE TO DO IT IN GOOD FAITH, WHICH WE'VE CERTAINLY DONE, AND

5    WE'VE DONE IT VERY WELL.  THE JAPANESE COMPANY WAS FOUNDED BY A

6    LAWYER AND OUR CEO HERE WENT TO LAW SCHOOL, SO THEY'RE AS GOOD

7    AS I'VE SEEN ON THAT.

8          THE COURT:  ALL RIGHT.

9       AND THEN FEEL FREE TO TAKE A GLANCE AT MY ORIGINAL

10   QUESTIONS THAT WERE SENT TO EACH OF YOU, AND WITH REGARDS TO

11   THE EVIDENCE THAT WAS PROFFERED BY THE PLAINTIFF, I'M GOING TO

12   GIVE EACH SIDE TWO AND A HALF MORE MINUTES FOR THOSE QUESTIONS,

13   AND THEN WE'LL CONCLUDE THIS HEARING.

14         MR. ABHYANKER:  YOUR HONOR, BEFORE THAT, MAY I HAVE A

15   CHANCE TO RESPOND TO THE --

16         THE COURT:  YOU WILL.  ONE MOMENT.

17      WAS THERE ANYTHING WITH REGARDS TO ANY OF THE EVIDENCE

18   THAT WAS PROFFERED BY COUNSEL THAT YOU WOULD LIKE TO ADDRESS ON

19   THE DEFENSE SIDE?

20         MR. MAKMAN:  I MEAN, I THINK MY PAPERS HAVE ADDRESSED

21   WHAT I WANTED TO ADDRESS, AND I -- YOU KNOW, SO --

22         THE COURT:  THE PAPERS ARE FINE AS FAR AS YOU ARE

23   CONCERNED?

24         MR. MAKMAN:  YEAH.

25         THE COURT:  ALL RIGHT.

1          COUNSEL, YOU MAY PROCEED.

2              MR. ABHYANKER:  SO FIRST, YOUR HONOR, THE TRADEMARK

3     HE'S MENTIONING WAS ABANDONED LITERALLY SEVEN OR EIGHT MONTHS

4     AFTER THIS LAWSUIT WAS STARTED.  SO AT THE TIME OF FILING THE

5     COMPLAINT, THE TRADEMARK WAS ACTIVE.

6          NUMBER TWO, WE HAVE ALLEGED WE'VE SUFFERED SIGNIFICANT

7     HARM.  WE WERE SEEKING INVESTMENT FROM THE SAME VC,

8     SEQUOIA CAPITAL, THEY INVESTED IN THEIR COMPANY, NOT OURS, IN

9     2022.

10         WE'VE ALLEGED THE FACT THAT IT WEAKENS OUR ASSOCIATION

11    BETWEEN OUR GOODS AND SERVICES AND THE REPUTATION AND QUALITY

12    OF OUR MARK BECAUSE ALLEGEDLY THEY TOOK IT LEGALLY.

13         NUMBER THREE, WITH RESPECT TO THE OFFSPRING ISSUE, WE HAVE

14    EXTENSIVELY SHOWN TESTIMONY FROM THE ACTUAL DEPOSITIONS THAT DO

15    NOT NEED TO BE SUMMARIZED HERE WHICH SHOWS THAT THESE COMPANIES

16    ARE ONE AND THE SAME.

17         FIRST OF ALL, THE -- TWO OF THE THREE BOARD OF DIRECTORS

18    ARE THE OFFICERS OF THE PARENT COMPANY.

19         MR. J.P. BIARD, WHO'S THE HEAD OF THE JAPANESE OPERATIONS,

20    SHOWS IN HIS LINKEDIN PROFILE ASSIGNMENT SIMULTANEOUSLY

21    EMPLOYED BY THE U.S. COMPANY.

22         THE LEASE THAT THEY HAVE IN THE U.S. IS PAID FOR BY THE

23    JAPANESE COMPANY.

24         ALL THE FUNDS THEY GET IS TRANSFERRED WHENEVER THEY NEED

25    IT FROM THE JAPANESE COMPANY AND NOBODY ELSE.

1      THEY HAVE, YOU KNOW, OFFICERS THE SAME, THEY HAVE OFFICE

2    SPACE THE SAME, THEY HAVE -- EVEN THE U.S. EMPLOYEES HAVE NO

3    SHARES IN THEIR OWN COMPANY, THEIR SHARES ARE IN THE JAPANESE

4    COMPANY.

5      SO THIS IS CLEARLY THE MOST CLEAR EVIDENCE TO SHOW THAT

6    THERE'S NO FACTS TO SUPPORT.

7      LASTLY, WE TALKED ABOUT THE FAMOUS MARKS.  THE CASE LAW --

8        THE COURT:  SLOW DOWN JUST A LITTLE BIT, COUNSEL.

9    WHEN I HEAR NOISE FROM THE COURT REPORTER, IT GIVES ME PAUSE.

10    SLOW DOWN AND TAKE A BREATH.

11        MR. ABHYANKER:  WELL, MAXNET, THE CASE WE CITED,

12    MAXNET, WHICH IS A 2020 CASE, IS NOT A FAMOUS MARK.

13      THERE'S NO ISSUE THAT THOSE MARKS HAVE BEEN DEEMED FAMOUS

14    MARKS.

15      THE FACT THAT MAYBE THERE'S AN ALLEGATION THAT SOME OF

16    THEM WERE FAMOUS HAS NOTHING TO DO WITH WHETHER OR NOT THE

17    TICKER SYMBOL USED IS A SOURCE CONFUSION IDENTIFIER TO

18    POTENTIAL CONSUMERS IN THE FUTURE.

19      SO WE BELIEVE WE'VE SUFFERED SIGNIFICANT HARM, AND WE'RE

20    SEEKING MONEY FROM THE SAME VC'S, WE WERE -- YOU KNOW, I DON'T

21    KNOW HOW BETTER TO PUT IT THAN THE OWN TESTIMONY OF ITS OWN

22    OFFICERS OF THIS DEFENDANT, AND WE HAVE CLEARLY BRIEFED THAT,

23    PROVIDED EVIDENCE IN OUR OPPOSITION WITH DIRECT QUOTES FROM

24    THOSE OPPOSITIONS -- FROM THOSE DEPOSITION TRANSCRIPTS.

25        THE COURT:  OKAY.  AND BECAUSE THE CASES ARE

1    BACK-TO-BACK, THE LEGALFORCE AND LEGALON, IS THERE ANYTHING YOU

2    WOULD LIKE TO SHARE WITH REGARDS TO LEGALON?  I THINK MOST OF

3    MY QUESTIONS THAT PERTAIN TO LEGALON HAVE BEEN ANSWERED, BUT I

4    DON'T WANT TO PRECLUDE YOU FROM COMMENTING ON THAT CASE IN THE

5    EVENT THAT YOU THINK THAT THERE WAS SOME AREA THAT WAS OMITTED.

6         COUNSEL FOR THE PLAINTIFF?

7              MR. ABHYANKER:  YES, ONE MORE THING.

8         THE JAPANESE CASE IS DISMISSED.  IT'S A FRIVOLOUS CASE,

9    AND THE JAPANESE COURT BASICALLY LAUGHED IT OUT OF COURT.  IT

10   IS --

11             THE COURT:  DO YOU HAVE ANYTHING THAT CAN BE LODGED

12   WITH THE COURT THAT REFLECTS THE DISMISSAL?

13             MR. ABHYANKER:  WELL, WE CAN, YES.  I'LL HAVE TO GET

14   IT FROM THE JAPANESE COUNSEL.  THAT'S MY UNDERSTANDING.  IT'S

15   IN JAPANESE.  THEY JUST HAD A HEARING AND IT WAS DISMISSED.

16             THE COURT:  WHAT DATE WAS THE HEARING BY CHANCE?

17             MR. ABHYANKER:  I DON'T HAVE IT MEMORIZED.  I DON'T

18   WANT TO MISSTATE MYSELF, YOUR HONOR.

19             THE COURT:  ALL RIGHT.  THAT'S FAIR.

20             MR. ABHYANKER:  I BELIEVE IT WAS IN AUGUST.

21             THE COURT:  ANYTHING ELSE YOU'D LIKE TO ADD THAT THE

22   COURT SHOULD CONSIDER IN TAKING THE REMAINDER OF THE TWO

23   MOTIONS UNDER SUBMISSION?

24             MR. ABHYANKER:  YOUR HONOR, I THINK THIS CASE

25   PRESENTS SOME UNIQUE OPPORTUNITIES FOR THE COURT, AND I ADMIT

1    THAT THERE'S NOT CLEAR CASE LAW.  BUT WE HAVE A, A REAL DISPUTE

2    HERE, WE HAVE REAL HARM HERE THAT WE'VE SUFFERED.

3         AND IF SOMEONE WAS TO EXPLAIN THIS TO A NON-LAWYER, IT

4    WOULD SEEM UNFAIR.  THERE'S A FUNDAMENTAL ISSUE OF FAIRNESS

5    THAT DOES NOT SEEM THAT IS BEING TAKEN INTO CONSIDERATION.

6         AND I THINK THE CASE LAW DOES SUPPORT OUR CONTENTIONS WITH

7    RESPECT TO THE USE IN COMMERCE.  I THINK THERE WAS A

8    MISSTATEMENT THAT IT HAS TO BE AFFIXED.  IT DOESN'T HAVE TO BE

9    AFFIXED, UNDER 15 U.S.C. 1127, TO GOODS AND SERVICES.

10        WE HAVE -- WE HAVE EXPLAINED CLEARLY, BESIDES THE HARMS,

11   THE SPECIFIC JURISDICTION, BECAUSE OF THE FACT THAT THEY FILED

12   A DECLARATION, A VERIFIED STATEMENT WITH THE FEDERAL COURT, AND

13   THEY HAVE NO AUTHORITY TO CHALLENGE THAT.

14        SO THAT'S IT WITH RESPECT TO THE JAPANESE DEFENDANT.

15        WITH RESPECT TO LEGALON AND LEGALFORCE, THE ISSUE ISN'T

16   THE WORD "LEGAL."  THERE'S PLENTY OF TRADEMARKS THAT HAVE THE

17   WORD "LEGAL."  WE'RE NOT DISPUTING THAT THEY COULD USE THE WORD

18   "LEGAL" IF THEY WANTED TO IF THEY WERE AN INDEPENDENT COMPANY

19   AND HAD NO PRIOR HISTORY.

20        HERE THE MARK THAT WE'RE TRYING TO SAVE IS NOT JUST THE

21   WORD "LEGAL."  THEY HAVE A DESIGN MARK, WHICH HAS A DESIGN

22   WHICH THEY HAVE NOW ADMITTED, AND AT LEAST AS WE PROVIDED THE

23   DECLARATIONS FOR, DERIVES PARTLY FROM THE PREVIOUS ONE, WHICH

24   IS A POLYGON SHAPE THAT HAD AN "L" IN IT.

25        SO THE INTENTION OF THEM TO ACTUALLY CREATE THAT NAME WAS

1    NOT FOR SOME KIND OF INNOCENT PURPOSE.  IT WAS CREATED TO

2    CREATE A FALSE ASSOCIATION WITH US OR THEM, BETWEEN THEM AND

3    THEIR PRIOR NAME, AND THAT IS THE ISSUE HERE.

4         SO IT'S VERY DIFFERENT TO SAY THAT THERE'S A COMPANY THAT

5    EXISTS THAT USES THE WORD "LEGAL" AND, THEREFORE, THEY SHOULD

6    BE ABLE TO USE IT, VERSUS ONE THAT HAS INTENTIONALLY TRIED TO

7    MANIPULATE THE PRIOR NAME IN MANNERS THAT STILL OBSCURE THE

8    CONNECTION WITH THE NAME BEING ASSESSED -- ALLEGED TO BE

9    INFRINGING.

10        AND, THEREFORE, WITH RESPECT TO THIS PARTICULAR DEFENDANT,

11   APART FROM THE ARGUMENTS WE HAVE WITH THE WORD "ON," WHICH WE

12   CAN GET AN EXPERT TO OPINE ON, WE DON'T BELIEVE THAT THERE IS A

13   CLEAR ARGUMENT HERE THAT SUPPORTS THAT NO REASONABLE JURY

14   CANNOT FIND THAT THERE'S INFRINGEMENT BETWEEN LEGALON AND

15   LEGALFORCE IN THIS CASE.

16             THE COURT:  THANK YOU.

17        AND FOR PURPOSES OF MY COURT REPORTER, MY APOLOGIES, I

18   DIDN'T HAVE OUR COURTROOM DEPUTY PROVIDE A MARKER, WE'RE NOW

19   DISCUSSING 22-CV-07627, WHICH IS LEGALFORCE RAPC WORLDWIDE PC,

20   VERSUS LEGALON TECHNOLOGIES INCORPORATED.

21        BECAUSE THE ARGUMENTS ARE SOMEWHAT INTERRELATED AND

22   INTRARELATED, I ALLOWED COUNSEL TO ARGUE BOTH DURING THIS

23   HEARING.  BUT I REALIZE I MAY NEED TO SEGREGATE THE MARK OF

24   WHEN WE COLLAPSED INTO THE SECOND CASE, AND MY PROFUSE

25   APOLOGIES.

 1          COUNSEL, NOW THAT I'VE PROVIDED THAT CLARITY -- AND THIS

 2     IS WITH RESPECT TO THE DOCKET THAT WAS NAMED ECF 77, 78, 79,

 3     AND 82, ANYTHING THAT YOU WOULD LIKE TO ADD TO RESPOND?  YOUR

 4     EARLIER 15 MINUTES EXPIRED AS TO THE PREVIOUS CASE, BUT YOU'RE

 5     NOW ALLOWED TO ADDRESS THIS CASE.

 6          MR. MAKMAN:  I JUST HAD A FEW THINGS I WOULD SAY IN

 7     RESPONSE TO WHAT HE JUST SAID.  I DON'T KNOW WHICH CASE THIS IS

 8     IN NECESSARILY.

 9          THE COURT:  PREFACE WHICH ONE YOU'RE SPEAKING OF SO

10     THAT WE HAVE A REALLY CLEAR RECORD, AND THAT'S MY ERROR.

11          MR. MAKMAN:  WILL DO.

12          SO ONE OF THE THINGS I WOULD NOTE IS THAT THE COMMENT

13     ABOUT THE LEASE BEING PAID BY JAPAN IS NOT CORRECT.

14          ANOTHER WOULD BE ON -- THE CORE ISSUE, AGAIN, HERE IS LACK

15     OF HARM.  IN THE ARGUMENT WE JUST HEARD, COUNSEL CITED

16     15 U.S.C. SECTION 1127, WHICH IS NOT ASSERTED IN EITHER ACTION.

17          WITH REGARDS TO THE SALE OF SHARES, HE SAID HE COULD HAVE

18     SOLD TO SEQUOIA.  THE SEQUOIA SALE WAS IN JAPAN, AND I HAVE A

19     DOCUMENT I WOULD READ.  HE SERVED A SUBPOENA ON THIS IN

20     DECEMBER OF LAST YEAR, WHICH I WAS NOT AWARE OF BECAUSE I WAS

21     NOT ON THE CASE, BUT I FOUND IT WHILE I WAS WORKING FOR THIS

22     HEARING, AND IT SAYS, "THIS FIRM REPRESENTS SEQUOIA CAPITAL

23     OPERATIONS IN CONNECTION WITH THE SUBPOENA ISSUED IN THE

24     ABOVE-REFERENCED MATTER.  IN RESPONSE TO THE SUBJECT SUBPOENA,

25     OUR CLIENT'S SEARCH HAS PRODUCED NO DOCUMENT AND NO

1   ELECTRONICALLY STORED INFORMATION IN OUR CLIENT'S POSSESSION,

2   CUSTODY, OR CONTROL."

3        SO THERE'S NOTHING IN THE AMERICAN ENTITY THAT RELATES TO

4   THIS INVESTMENT ACCORDING TO THE RESPONSE TO THE SUBPOENA THAT

5   HE RECEIVED BACK IN DECEMBER OF LAST YEAR.

6        AND BEYOND THAT, I THINK I HAVE SAID WHAT I NEED TO SAY.

7        WE DID GO THROUGH THE SLEEKCRAFT FACTORS IN THE LEGALON

8   CASE, AND INTENT IS ONLY ONE OF THEM.  THEY WERE SELLING TO

9   SIGNIFICANTLY DIFFERENT CUSTOMERS, THE SOPHISTICATED CUSTOMERS.

10  THE SIMILARITY IS NOT GREAT.

11       AND I DO NOT CONSIDER THE CLAIM OF INFRINGEMENT PLAUSIBLE.

12  THE ONLY OVERLAP IS THE WORD "LEGAL," AND THE HISTORY AND TO

13  THE EXTENT THAT THERE'S BEEN KIND OF FOREIGN USE OF THE WORD

14  "LEGALFORCE" UNDER THE ABITRON CASE IS NOT RELEVANT TO AND IS

15  NOT A HARM.  THAT CASE EXPLICITLY DISCUSSES THE FACT THAT

16  FOREIGN CONDUCT IS NOT A HARM TO A U.S. TRADEMARK PROPERTY

17  RIGHT.

18       THAT'S -- SO THAT'S WHAT I HAVE TO SAY.

19       THE COURT:  AND THE COURT NOTED THAT COUNSEL HAD SAID

20  THAT FOR SEVEN TO EIGHT MONTHS, IT WAS BEING USED AND THEN

21  ABANDONED IN TERMS OF ITS DESIGNATION.

22       DO YOU CONCEDE THAT?

23       MR. MAKMAN:  NO.  NO.  WE FILED A -- WE FILED AN

24  INTENT TO USE THING, APPLICATION.  THAT MEANS WITHIN SIX

25  MONTHS, YOU HAVE TO EITHER EXTEND OR FILE EVIDENCE OF USE.

1          THE COURT:  OKAY.

2          MR. MAKMAN:  SO WE DIDN'T USE, WE DIDN'T FILE, IT

3     WENT ABANDONED.

4          THE COURT:  THANK YOU.  I JUST WANTED TO MENTION THAT

5     SINCE IT WAS BROUGHT UP IN HIS SHORT REBUTTAL ARGUMENT.

6          MR. MAKMAN:  SURE.

7          THE COURT:  ANYTHING FURTHER BEFORE WE CONCLUDE THIS

8     HEARING?

9          AND AS IT RELATES TO 22-CV-03724, WE'RE SPEAKING OF

10    ECF 95, 100, AND 106.

11         MR. ABHYANKER:  YOUR HONOR, SO FIRSTLY, THE ISSUE OF

12    WHETHER THE JAPANESE COMPANY PAYS THE RENT FOR THE

13    SAN FRANCISCO ENTITY, THERE'S A DIRECT QUOTE, I CAN'T

14    PARAPHRASE IT, IT'S IN THE ATTACHMENTS THAT ARE FROM

15    TRANSCRIPTS FROM MR. BIARD.

16         APART FROM THAT, YOU KNOW, IT'S NOT CORRECT THE WAY HE'S

17    DESCRIBING HOW TRADEMARK LAW WORKS.  I'M A TRADEMARK ATTORNEY.

18    I DON'T -- IT'S NOT THE FACT THAT YOU FILE AN INTENT TO USE

19    MARK AND WITHIN SIX MONTHS YOU PROVIDE PROOF OF USE.

20         YOU FILE AN INTENT TO USE MARK.  THE U.S. GOVERNMENT

21    EXAMINES THAT MARK, THEY ISSUE OFFICE ACTIONS AGAINST THAT

22    MARK, YOU GET A NOTICE OF ALLOWANCE, AND THAT STARTS A 30 DAY

23    OPPOSITION FOR IT.

24         SO AT THAT -- ALONG THAT ENTIRE JOURNEY, THERE IS NO

25    REPRESENTATION TO THE GOVERNMENT THAT THEY'VE SIMPLY JUST FILED

1       THE DOCUMENT AND INTENDED TO NEVER USE IT.  SO HE

2   MISCHARACTERIZES HOW THAT WORKS IN TERMS OF THE U.S. POLICY AND

3   PROCEDURE OF THE U.S. PTO.

4       THERE'S A SWORN DECLARATION THAT THEY HAVE AN INTENT TO

5   USE, OR THERE'S A SWORN DOCUMENT THAT IS REPRESENTED TO THE

6   GOVERNMENT, AND THAT WAS NOT WITHDRAWN UNTIL I BELIEVE FEBRUARY

7   OF THIS YEAR.

8       THIS LAWSUIT WAS FILED IN JUNE OF LAST YEAR, I BELIEVE,

9   RIGHT, JUNE OF LAST YEAR.  SO THIS IS AN OLDER CASE.

10      AND YOU CAN'T JUST ESCAPE THE LAWSUIT BECAUSE DURING THE

11  LAWSUIT YOU DECIDE, WELL, I'M GOING TO START MAKING CORRECTIVE

12  ACTION.  YOU CAN MITIGATE THE HARM, BUT YOU CAN'T ERASE THE

13  DAMAGES CAUSED, AND WE DO HAVE SIGNIFICANT DAMAGES.

14      REPUTATIONAL HARM IS A REAL THING WHEN THE OTHER PARTY

15  THAT IS A DEFENDANT IS USING YOUR MARK IN WAYS THAT DAMAGE A

16  PLAINTIFF'S REPUTATION, AND THAT QUANTIFICATION CANNOT BE DONE

17  ALONE IN A VACUUM.  IT NEEDS TO BE DONE THROUGH THIS.

18          THE COURT:  THANK YOU.

19      MATTER SUBMITTED?

20          MR. MAKMAN:  CAN I RESPOND TO THE APPLICATION FOR

21   JUST A MOMENT?

22          THE COURT:  BRIEFLY.

23          MR. MAKMAN:  VERY BRIEFLY, SURE.

24      SO THE -- AND THE USE QUESTION WAS ABOUT WHETHER FILING

25  THE APPLICATION CREATED JURISDICTION IN CALIFORNIA.  IT'S AN

1   INTENT TO USE, NOT ACTUAL USE, AND HIS ARGUMENT THERE WAS THAT

2   HE WAS HARMED BY ACTUAL USE BASED ON A CLAIM OF AN INTENT TO

3   USE.  THAT DOESN'T MAKE SENSE LOGICALLY.

4            MR. ABHYANKER:  YOUR HONOR, IF YOU LOOK AT THE

5   TRANSCRIPTS FROM THE LAST HEARING, DEFENSE COUNSEL WAS ASKED

6   WHEN THEY CHANGED THE NAME AND STOPPED USING THE MARK.  IF I

7   RECALL CORRECTLY, THEY ONLY STOPPED USING THE MARK AND CHANGED

8   IT IN JANUARY OR FEBRUARY OF THIS YEAR.

9       SO THAT'S INCONSISTENT WITH THE PRIOR REPRESENTATIONS THAT

10  DEFENDANT'S COUNSEL HAS MADE TO THIS COURT.

11           THE COURT:  ALL RIGHT.  THE MATTER IS NOW SUBMITTED.

12           MR. MAKMAN:  THANK YOU.

13           THE COURT:  IT WAS A PLEASURE SEEING YOU BOTH.  AND

14  AS YOU KNOW, THE COURT'S RULING WILL ISSUE WITHIN A WEEK FROM

15  TODAY.

16      THANK YOU.

17           MR. ABHYANKER:  THANK YOU, YOUR HONOR.

18           THE COURT:  THANK YOU.

19      (THE PROCEEDINGS WERE CONCLUDED AT 2:46 P.M.)

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8   STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9   280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10  CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16  _____
    LEE-ANNE SHORTRIDGE, CSR, CRR
17  CERTIFICATE NUMBER 9595

18              DATED:  DECEMBER 29, 2023

19

20

21

22

23

24

25